

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-1996

# Delli Santi v. CNA Insurance Co

Precedential or Non-Precedential:

Docket 94-5331,94-5347

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Delli Santi v. CNA Insurance Co" (1996). *1996 Decisions.* Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 94-5331 and 94-5347
_____

EVELYN DELLI SANTI

                    Appellant in No. 94-5331

          vs.

CNA INSURANCE COMPANIES;
CONTINENTAL CASUALTY COMPANY;
RICHARD FARAH


EVELYN DELLI SANTI

               vs.

CNA INSURANCE COMPANIES;
CONTINENTAL CASUALTY COMPANY;
RICHARD FARAH

               CNA Insurance Companies;
               Continental Casualty Company

               Appellants in No. 94-5347
          _____

    Appeal from the United States District Court
          for the District of New Jersey
            (D.C. Civ. No. 88-cv-05137)
          _____

               Argued
            March 7, 1996
   Before:  MANSMANN* and ALITO, Circuit Judges, and
   RESTANI, Judge, Court of International Trade.**

            (Filed June 20, 1996)
          _____


*        The Honorable William D. Hutchinson was a member of the
original panel which heard argument in this appeal on March 6,
1995.  He died on October 8, 1995 before the appeal was resolved;
Judge Mansmann was designated to serve in his place on the
reconstituted panel.

**       Honorable Jane A. Restani, Judge, United States Court
of International Trade, sitting by designation.

William C. Slattery, Esquire (ARGUED)
Norris, McLaughlin & Marcus
721 Route 202-206
P.O. Box 1018
Somerville, NJ  08876

Neil M. Mullin, Esquire
Jon W. Green, Esquire
Smith Mullin, P.C.
200 Executive Drive
Suite 155
West Orange, NJ  07052

  Counsel for Evelyn Delli Santi

Jeffrey S. Goldman, Esquire
Allison C. Blakely, Esquire (ARGUED)
Fox & Grove
311 South Wacker Drive
Suite 6200
Chicago, IL  60606

  Counsel for CNA Insurance Companies
   and Continental Casualty Company
                    _____


                OPINION OF THE COURT
                    _____


MANSMANN,  Circuit Judge.
        In this discrimination case tried pursuant to the New
Jersey Law Against Discrimination, the jury found that Evelyn
Delli Santi proved by a preponderance of the evidence that CNA
Insurance Company discharged her in retaliation for her
complaints of age and sex discrimination.  The jury specifically
rejected CNA's assertion that it discharged Delli Santi because
she allegedly inflated her gasoline expense records.
Nonetheless, the district court granted CNA's motion for judgment
as a matter of law and conditionally granted its motion for a new
trial, holding that CNA proved as an affirmative defense that,
despite retaliatory intent, it would have discharged Delli Santi
in any event.
        We find that, under these specific circumstances of the
jury's rejection of the non-discriminatory reason proffered by
the defense, the court could not utilize this evidence against
the plaintiff.  Therefore, since there was legally sufficient
evidence to support the jury's verdict, we will vacate the
district court's judgment as a matter of law on the affirmative
defense for CNA.  We will also vacate the district court's
conditional grant of a new trial because, based upon our review
of the record, the verdict was not against the clear weight of
the evidence.
        We will, however, affirm the district court's order
granting CNA a new trial unless Delli Santi agrees to accept a

remittitur of the jury's excessive pain and suffering award. Therefore, we will return this case to the district court for entry of judgment on the jury verdict, including the jury's front pay award of $152,266 representing Delli Santi's future economic losses.

I.

In 1951, Evelyn Delli Santi began her employment as a typist clerk with The American Casualty Insurance Company, which eventually merged with CNA. By the mid-1960s, she was a first-party claims handler. CNA continued to promote Delli Santi and, ultimately, she became a claims representative. Although CNA's home office is located in Chicago, Illinois, Delli Santi reported to the Cedar Knolls, New Jersey branch office, part of CNA's eastern region.

Delli Santi first complained about discrimination during an employee communication session ("ECS") with Richard Farah, a New Jersey branch claims manager, in October 1986. According to Delli Santi, she told Farah that her supervisors in the past informed her that the company would not promote her above grade level 34 until she came in from her field position. When Farah told her this was untrue and there were two men in field positions at grade level 36 (a higher level), Delli Santi stated: "[T]hat's pretty good. I said, that's discrimination, I says, sex and age. . . . And I told him, I didn't think the company really cared about promoting women because I had a problem once before, as you heard early on, when we merged, and I didn't think it was right."

In April 1987, Delli Santi complained of discrimination to Dennis McCarthy, her immediate supervisor, at her annual performance review. Dissatisfied with CNA's failure to promote her along with male counterparts in the field, she said, "[T]here you go, there it is, discrimination. I said, this is not fair, and I'm not happy at all with this situation." According to Delli Santi, McCarthy told her that she should talk to Farah about her complaints.

The third discrimination complaint arose one week later in another ECS meeting with Farah. There Delli Santi voiced her disapproval about the refusal to promote her to grade level 36, stating "[A]s far as I'm concerned it's more discrimination, harassment, age and sex discrimination, and its not right, and I'm not happy with it at all."

After making these complaints, Delli Santi's expense reports were called into question. Delli Santi's gas mileage and the number of handwritten receipts for her May expense report were substantially the same as they were in three previous expense submissions that McCarthy and Farah had reviewed and approved for the last half of March and all of April 1987. When Delli Santi submitted her expense reports for May 1987, however, McCarthy took exception to the amount reported for gas purchases because "the numbers were a little bit off." Delli Santi's May 1987 expense reports reflected fifteen gasoline purchases during a thirty-one day period in which she drove less than 800 miles. Only four of the gasoline purchases were documented by

identifiable service station receipts.  The remaining eleven purchases were documented by Delli Santi's own "in lieu of" vouchers, which had handwritten dollar amounts and dates, an acceptable alternative to service station receipts.

Subsequently, CNA conducted an internal investigation into Delli Santi's expense accounts.  Based upon the results of this investigation, CNA concluded that Delli Santi had inflated her expense accounts.  On September 16, 1987, CNA terminated Delli Santi after thirty-six years of employment ostensibly because she misrepresented her gas expenses for her company car.  At the time Delli Santi was 59 years old.

In October 1988, Delli Santi filed a multi-count complaint in a New Jersey state court against CNA and Farah. Delli Santi's original complaint included claims pursuant to both the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.   621-634 (1994) and the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann.   10:5-12d (West Supp. 1994).  CNA removed the case to the U.S. District Court for the District of New Jersey.  Prior to trial, however, Delli Santi abandoned her ADEA claim.  Consequently, after the district court disposed of all pre-trial motions, the sole issue for the jury to decide was whether the evidence supported Delli Santi's LAD retaliation claim.  This claim was tried to a jury from January 20 to February 10, 1994.

At trial, Delli Santi argued that CNA singled her out for termination, not because she falsified her expense accounts, but because she had complained about discrimination.  In support, Delli Santi relied, inter alia, upon the following stipulation, which was read to the jury:

> According to the CNA fleet reports, from
> January 1985 through March 1988, 215 persons
> achieved a mileage of less than 10 miles per
> gallon in one of the 13 quarters reported.
> Of those persons, 31 had a reported mileage
> of less than 10 miles per gallon in more than
> one reporting quarter.

App. at 1090.

In addition to the above stipulation, Delli Santi pointed to the following October 27, 1987 internal CNA memo, which was issued to all fleet services managers:

> We have discovered situations such as
> vehicles consistently averaging less than 10
> miles per gallon (our fleet averages 23+
> m.p.g.) . . . .  In some instances, these
> conditions have existed for several quarters
> which is an indication that drivers are not
> being counseled.

App. at 326.  Although the memo advised managers to "counsel" these drivers, there was no directive to investigate, discipline or terminate any of them.

The memo referring to widespread instances of arguably suspicious low mileage similar to Delli Santi's was also

distributed to David Koester, senior vice president of administration, who testified at trial that no action whatsoever was taken against these drivers. Indeed, Koester and Kent Crassweller, an investigation manager, conceded that they were not aware of anyone -- except Delli Santi -- who was investigated, disciplined or terminated for reporting low gas mileage. Koester's testimony, however, is at odds with his statement that any fleet driver reporting under ten miles per gallon should have been investigated because "it's an indicator of some issue."

At trial, CNA introduced the following evidence. Larry Schroeder, the Chicago corporate security manager, reviewed Delli Santi's May expense report and decided to open an investigation. Schroeder stated that he opened the Delli Santi investigation because the handwritten vouchers, coupled with the low mileage, were "strange." Accordingly, in June 1987 Crassweller, an investigation manager, and Kathy Foster, a regional personnel manager, interviewed Delli Santi, asking her to explain the handwritten receipts. Delli Santi stated that she wrote them herself on receipt pads from her brother's business. When questioned about her gas mileage, Delli Santi stated that the car "gets what it gets" and explained that (1) she sometimes would allow her car to idle (running the air conditioner or heater depending on the season); (2) children might be stealing gas from her car; and (3) the car "ran rough." Following the interview, Crassweller reported this conversation to Schroeder and Robert Keith, corporate security manager.

Crassweller then returned to Chicago and supervised a review of several of Delli Santi's past expense reports, which revealed the following: if Delli Santi's handwritten generic receipts were totally discounted and her gasoline calculated solely on the basis of verifiable service station receipts, the gasoline mileage for her 1984 Dodge Aries K would have been eighteen miles per gallon for the first quarter of 1986; twenty-four miles per gallon for the third quarter of 1986; seventeen miles per gallon for the fourth quarter of 1986; and sixteen miles per gallon for the first quarter of 1987. These averages were consistent with the estimated mileage of twenty-three miles per gallon for her vehicle and the company's fleet-wide average of approximately twenty-three-and-a-half miles per gallon.

The investigation into Delli Santi's expense reports, over a period of more than three years, revealed an inverse relationship between the average number of handwritten receipts submitted per expense period and gasoline mileage. In 1984, Delli Santi averaged eleven to thirteen miles per gallon, with an average of two to three handwritten receipts per expense period; in 1985, she averaged about ten miles per gallon, with an average of three to four handwritten receipts; in 1986, she was getting about seven miles per gallon, with an average of four handwritten receipts per expense period; and, finally, in 1987, Delli Santi got only six miles per gallon, with an average of five handwritten receipts per expense period.

CNA's corporate security manager, Robert Keith, stated that he was "highly suspicious" and believed Delli Santi was

stealing, but he was reluctant to terminate Delli Santi without first affording her the benefit of the doubt.  Because Delli Santi had stated at the outset of the investigation that the car "ran rough," Keith decided to have her car test driven.  Accordingly, Farah directed Leonard Polizzi, a manager in another CNA office, to test drive the car and keep a record of the gas mileage.  Polizzi drove Delli Santi's car back and forth to his office, a round trip of eighty miles per day, and reported that the car had given him twenty-four to twenty-seven miles per gallon with no mechanical problems.  Because Polizzi performed the test drive generally under highway conditions, the test drive may not have duplicated Delli Santi's exact driving conditions.

Keith testified nonetheless that the test drive results confirmed his belief that Delli Santi used inflated expense accounts to steal.  He immediately reported this belief to his superior David Koester, senior vice president of administration, and Carolyn Murphy, senior vice president of field operations.  Koester and Murphy, who are both located in Chicago, agreed with Keith.

After reviewing the recommendations, Meyer and Keith discussed the matter.  Keith told Meyer that he had already discussed the matter with Koester and Murphy and had informed Meyer that the penalty for employee theft at CNA was uniform and unyielding:  mandatory termination.  Specifically, Keith testified:

> [W]e do not make exceptions to our policy and practice of terminating people who either lie to us, or who steal from us.  We don't make an exception.  We never have, we can't make an exception for the reason of, there has to be fairness and consistency, and people need to understand the rules, and that's what we've done in the past, and that's what we'll continue to do in the future.  It's the only way we can run a company.

App. at 1375.

At the close of this evidence, on February 10, 1994, the jury returned a verdict in favor of Delli Santi.  Answering specific interrogatories, the jury found:  that Delli Santi proved by a preponderance of the evidence that CNA discharged her in retaliation for her complaints about discrimination; and that CNA failed to prove that, even though it terminated Delli Santi in retaliation for her complaints about discrimination, CNA would have discharged her in any event for stealing.  The jury returned a $627,866 award for compensatory damages, assessing $300,000 for pain and suffering.  The district court declined to submit the issue of punitive damages to the jury.  On February 22, the district court entered judgment on the jury verdict.

Subsequently the district court entered a post-judgment order granting judgment as a matter of law in CNA's favor because the court agreed with CNA's claim that it would have discharged Delli Santi, regardless of retaliatory intent, due to CNA's discovery that CNA had allegedly falsified her expense accounts.

In addition to granting judgment as a matter of law on this claim, the district court conditionally granted a new trial. Further, the district court conditionally granted a new trial based upon damages unless Delli Santi accepted a remittitur of the pain and suffering award from $300,000 to $5,000. The district court granted CNA's motion for a remittitur on the basis of future earnings totaling $152,266 because it found that Delli Santi was ineligible for reinstatement with CNA. Finally, the district court denied, without prejudice, Delli Santi's application for pre-judgment interest and request for counsel fees and expenses. Both parties filed timely notices of appeal.

## II.

The New Jersey Law Against Discrimination "makes retaliatory discrimination an unlawful employment practice." Jamison v. Rockaway Township. Bd. of Educ., 577 A.2d 177, 182 (N.J. Super. Ct. App. Div. 1990). An unlawful employment practice occurs when a person, whether an employer or employee, takes "reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act." N.J. Stat. Ann. 10:5-12d.

To establish a prima facie case of retaliation, an employee must show by a preponderance of the evidence that (1) he or she "engaged in a protected activity known to the employer;" (2) he or she thereafter was "subjected to [an] adverse employment decision by the employer;" and (3) there was a "causal link" between the protected activity and adverse employment decision. Jamison, 577 A.2d at 182 (citing Wrighten v. Metropolitan Hosps., Inc., 726 F.2d 1346, 1354 (9th Cir. 1984) and Velantzas v. Colgate-Palmolive Co., Inc., 536 A.2d 237, 238 n.1 (N.J. 1988)); accord Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995) (citing Jamison, 577 A.2d 177 and Wrighten, 726 F.2d at 1354); Wachstein v. Slocum, 625 A.2d 527, 534 (N.J. Super. App. Div.), certif. denied, 636 A.2d 521 (N.J. 1993); see also Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 n.1 (3d Cir. 1993); Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir.), cert. denied, 502 U.S. 940 (1991); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1988), cert. denied, 493 U.S. 1023 (1990).

Once an employee succeeds in showing these facts, he or she establishes a prima facie case of retaliation and the burden of production (although not the burden of persuasion) "shifts to the employer to articulate some legitimate non-retaliatory reason for the adverse action." Jamison, 577 A.2d at 182 (citing Wrighten, 726 F.2d at 1354). If the employer comes forward with evidence showing some legitimate non-retaliatory reason, the employee still has the opportunity to produce evidence sufficient to persuade the factfinder by a preponderance of the evidence that the employer nevertheless harbored a discriminatory intent. Id. An employee can make this showing by producing evidence and proving to the factfinder's satisfaction that "the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer." Id. (citing

Wrighten, 726 F.2d at 1354 (citing Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Assuming the employee meets this burden, a presumption arises under New Jersey law "that the adverse employment action was the product of improper retaliatory intent." Id. (citing Wrighten 726 F.2d at 1354). Then "the employer must prove by the preponderance of the evidence that the adverse action would have been taken regardless of retaliatory intent." Id. (citing Wrighten, 726 F.2d at 1354). But see Jalil, 873 F.2d at 706 (ultimate burden of persuasion always remains with the employee who seeks to prove a retaliation claim).

## A.

At trial, CNA moved for judgment as a matter of law at the close of Delli Santi's case and again at the close of all the evidence, arguing that Delli Santi had not adduced sufficient evidence to meet either her prima facie burden or her burden of proving pretext. On cross-appeal, CNA asks us to review the district court's denial of its motion which sought judgment that CNA had not discharged Delli Santi out of retaliation for her complaints of discrimination.

We exercise plenary review over the district court's order granting a Rule 50(b) motion for judgment as a matter of law. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993) (citing Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 (3d Cir.), cert. denied, 114 S. Ct. 309 (1993)). Our role is to determine "whether the evidence and justifiable inferences most favorable to the [non-moving] party afford any rational basis for the verdict." Anastasio v. Schering Corp., 838 F.2d 701, 705 (3d Cir. 1988) (citing Bhaya v. Westinghouse Electric Corp., 832 F.2d 258, 259 (3d Cir. 1987), cert. denied, 488 U.S. 1004 (1989)); Blum v. Witco Chem. Corp., 829 F.2d 367, 372 (3d Cir. 1987).

In our view, Delli Santi presented sufficient evidence to allow a rational jury to find that her supervisors (who were aware of her discrimination complaints) possessed a retaliatory intent and, thus, tainted the ultimate decision. For years Delli Santi submitted expense reports indicating low gas mileage without incident. In fact, in February 1986, Farah (who at the time was substituting for Powell) approved Delli Santi's expense report even though she reported less than five miles per gallon. He and McCarthy thereafter approved Delli Santi's gas expenditures on three separate occasions (the last half of March and all of April 1987) when she reported gas mileage well under ten miles per gallon. So, too, Franceschini approved Delli Santi's expense reports in December 1986 and January 1987 even though she reported less than ten miles per gallon. The reports approved by McCarthy, Farah and Franceschini did not differ significantly from her May 1987 expense report. It was only after Delli Santi voiced concerns about discrimination that CNA decided to investigate her gas expense reports because the numbers, which were the same for years, were now "a little bit off."

We also find that there was sufficient evidence to support the jury's finding that CNA's proffered reason for Delli

Santi's termination was pretextual. Despite Koester's statement that CNA had a policy of investigating drivers reporting less than ten miles per gallon, "there was uncontested evidence of CNA's inertia in the face of its knowledge that some 215 employees had achieved mileage of less than 10 miles per gallon. Of these, 31 had reported mileage of less than 10 miles per gallon in more than one reporting period." See Delli Santi, No. 88-5137, slip op. at 15-16. A CNA internal memorandum reported that CNA was aware of drivers "consistently averaging less than 10 miles per gallon" and, "[i]n some instances, these conditions have existed for several quarters"; yet, Koester "was unaware of any driver who reported less than ten miles per gallon ever being investigated by Corporate Security or ever being terminated for misrepresentation of his gas expenses." Id. at 16.

Thus, there was ample evidence from which the jury could infer that CNA singled out Delli Santi given that it did not investigate, discipline or terminate any other employee who reported low gas mileage. Accordingly, the district court did not err in denying CNA's motion for judgment as a matter of law based on its retaliation claim.

## B.

On the basis of this evidence, however, the district court conditionally granted CNA a new trial on Delli Santi's retaliation claim. In reviewing the district court's decision to set aside the verdict as against the clear weight of the evidence, we "exercise a closer degree of scrutiny and supervision" because this case deals with "material which is familiar and simple, . . . lying well within the comprehension of [the] jurors. . . ." Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993) (internal quotes omitted) (ellipses and alteration in original). Because the subject matter of this case "is simple and within a layman's understanding," we give the district court "less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations." Id. (internal quote omitted).

With respect to the court's ruling that the verdict was against the clear weight of the evidence, we caution that the district court ought only to grant a new trial on this basis where "a miscarriage of justice would result if the verdict were to stand." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992) (quoting Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)). We have observed that "[t]his limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its `judgment of the facts and the credibility of the witnesses for that of the jury'." Id. (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir.) (in banc), cert. denied, 364 U.S. 835 (1960)). "Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts." Id. With this standard of review in mind, we turn to the merits of the new trial motion.

In considering CNA's motion for a new trial, the

district court decided that Delli Santi presented sufficient evidence to establish a prima facie case of retaliation. Nevertheless, without repudiating its earlier determination (on CNA's motion for judgment as a matter of law) that Delli Santi "generated enough speculation in the eyes of the jury to allow them to dismiss CNA's explanation as pretext," Delli Santi, No. 88-5137, slip op. at 17, the district court concluded that the jury's finding of pretext was against the weight of the evidence.

We believe that the jury could have rationally inferred that the Chicago decision-makers -- Koester, Keith, and Murphy -- were not the effective decision-makers, but rather their decision to fire Delli Santi was influenced by her managers in New Jersey. Though CNA terminated Delli Santi on September 16, 1987, after McCarthy, Farah, Franceschini, Foster, Meyer, and Ottinger had signed Delli Santi's termination notice, neither Koester nor Murphy signed the internal termination document until about one week later. Koester's own testimony buttressed this post-termination approval when he admitted that he did not sign the internal termination document until September 22, 1987. Keith conceded on cross-examination that no relevant documents suggested that Koester and Murphy took part in the decision-making process before September 22, 1987, six days after Delli Santi's termination. Ottinger, moreover, testified that once Meyer announced his decision to approve Delli Santi's termination at a late August 1987 meeting, which Koester, Keith, and Murphy did not attend, the firing would have occurred by the next day except for the fact that Delli Santi was on vacation. Thus, the jury had an entirely rational basis for concluding that the Chicago decision-makers did not base their decision "completely on the basis of the investigation by Corporate Security" and their "overwhelming reasonable belief that Delli Santi was stealing from the company through the submission of fraudulent expense reports," see Delli Santi, No. 88-5137, slip op. at 30, but instead that her termination was the product of a retaliatory animus on the part of her New Jersey branch office supervisors.

In addition, the memorandum and the stipulation indicating CNA's failure to investigate, terminate or otherwise discipline any other employee who appeared to inflate gas purchases support the jury's finding that the articulated reason for discharging Delli Santi was a pretext. Although the district court recognized that Delli Santi could defeat CNA's motion for a conditional grant of a new trial if she "prove[d] that she was singled out; that others had submitted the same or substantially similar expense reports and had not been disciplined in a like manner," the court failed to consider other substantial evidence; namely, that for almost fourteen years Delli Santi had submitted similar reports without anyone questioning her gas expenditures, that Farah and McCarthy initiated the so-called "investigation" into Delli Santi's expense reports only after she had complained to them about sex and age discrimination, that over two hundred other drivers similarly reported under ten miles per gallon of gas, and over thirty fleet drivers did so in more than one reporting period. CNA, however, never disciplined, investigated,

or terminated a single employee for the same reason it terminated Delli Santi.

The district court should not have required Delli Santi to prove "selective enforcement of CNA's policy against employee theft." Instead, Delli Santi met her burden of showing that the company did not enforce such a policy by the evidence that other employees were claiming excessive gasoline expenses without any fear of investigation or repercussion, nor especially, termination. The jury, by drawing reasonable inferences from the evidence adduced at trial, could rationally conclude that the legitimate non-retaliatory reason offered by CNA was a pretext for discharging Delli Santi. We, therefore, conclude that the grant of a new trial was not consistent with a sound exercise of discretion since the jury's finding of pretext was supported by the clear weight of the evidence.

C.

Although the district court found that Delli Santi met her burden of proving retaliatory discharge, the district court held that CNA was nonetheless entitled, after the jury verdict and as an "affirmative defense", to argue to the court that although there may have been retaliatory intent in her termination, Delli Santi would still have been dismissed in any event due to her fraudulent expense submissions.

A district court should enter judgment for an employer as a matter of law on its "affirmative defense" "only if the record shows that [the employer] established the defense so clearly that no rational jury could have found to the contrary." E.E.O.C. v. State of Del. Dept. of Health and Social Servs., 865 F.2d 1408, 1414 (3d Cir. 1989) (citing Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1177 (3d Cir. 1976), cert. denied, 429 U.S. 1053 (1977), and Arkwright Mut. Ins. Co. v. Philadelphia Elec. Co., 427 F.2d 1273, 1275 (3d Cir. 1970)) (footnote omitted). Here, too, "we must view the evidence most favorably to [the employee] and accord [her] the benefit of all justifiable inferences." Id. (citing Bhaya, 832 F.2d at 259 and Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 113 (3d Cir.), cert. denied, 484 U.S. 853 (1987)).

In granting CNA's motion for a judgment as a matter of law on its "affirmative defense," the court reasoned that the ultimate decision-makers (Koester, Keith, and Murphy) were unaware of any retaliatory intent and, given the "overwhelming evidence of Delli Santi's theft," coupled with CNA's policy to terminate those employees who it believed were stealing, there was no evidence "from which a jury could have rationally inferred that CNA would not terminate an employee who the company believed was engaging in expense account misrepresentation." Delli Santi, No. 88-5137, slip op. at 25-26.

We cannot agree with the district court's statement that "[t]here was no evidence from which a jury could have rationally inferred that CNA would not terminate an employee who the company believed was engaging in expense account misrepresentation." Delli Santi, No. 88-5137, slip op. at 25-26. In so concluding, we are drawn again to the stipulation that over

200 CNA employees were reporting mileage of less than ten miles per gallon and CNA's awareness of this fact as evidenced by the October 27, 1987, internal memorandum conceding that these drivers were not being counseled.  See supra pp. 7-8.

With this evidence, a jury could have rationally inferred that CNA was singling out Delli Santi based upon her discrimination claims because it failed to investigate, discipline or terminate any other employee (over 200 of them) for unexplainably low gas mileage, which, as stated by Koester, "is an indicator of some issue."  Because Koester and Crassweller admitted during trial that they were not aware of CNA investigating, disciplining, or terminating persons other than Delli Santi for reporting excessively low gas mileage, the jury could conclude both that low gas mileage was "an indicator of some issue" only because Delli Santi voiced discrimination claims and that CNA's policy against company theft did not dictate Delli Santi's (or anyone else's) termination for inflating gas expenditures.

Our conclusion is further supported by the evidence that, to the time of trial, CNA had failed to enforce its policy against expense account fraud.  A CNA employee, Harold Ronin, stated that even though CNA fleet records accurately reflected drivers reporting under ten miles per gallon, he had no intention whatsoever of sending their names to corporate security for possible investigation.  Thus, despite Keith's admonition that CNA does not "make exceptions to [its] policy and practice of terminating people who either lie to us, or who steal from us," a reasonable factfinder could conclude that the evidence of fraudulent gas expense reports would not have led to Delli Santi's termination on legitimate grounds.

Finally, we consider whether the district court erred when it conditionally granted CNA a new trial on its "affirmative defense."  Our reasoning here follows that which we have already stated in reversing the district court's order granting CNA's motion for judgment as a matter of law on this "affirmative defense."  Briefly, we hold that CNA failed to meet its burden of persuasion on this issue because the jury rejected outright CNA's assertion that Delli Santi was discharged for theft.  Indeed, once the jury found that CNA's proffered reason for Delli Santi's discharge (employee theft) was a pretext, the district court could not later rely on this reason, raised as an affirmative defense in a post-verdict motion.  Once again, on the basis of this record, we cannot say that the verdict was against the clear weight of the evidence.

### III.

After the jury's verdict for Delli Santi, the district court also entered judgment for CNA as a matter of law on the issue of whether Delli Santi was ineligible for future employment or front pay because of her alleged theft.  The district court relied upon Massey v. Trump's Castle Hotel and Casino, 828 F. Supp. 314 (D.N.J. 1993), where the court held that an employer who unlawfully discharges an employee could use after-acquired evidence (which would have led to the employee's termination on

lawful and legitimate grounds) "to bar the specific remedies of reinstatement and front-pay if the employer demonstrates that, based solely on that misconduct, it would have made the same employment decision regarding that employee."  Id. at 328.  The court in Massey reasoned that "to require employers to reinstate or provide front-pay to an employee today that they can now fire legitimately tomorrow would be nonsensical."  Id. at 323.  SeeMcKennon v. Nashville Banner Publ. Co., 115 S. Ct. 879, 886 (1995) (where employer discovers after termination, that employee engaged in wrongdoing, generally "neither reinstatement nor front pay is an appropriate remedy").

We find that the district court erred by allowing CNA to assert as an "affirmative defense" its claim that Delli Santi was ineligible for front pay because this case does not involve after-acquired evidence.  In Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1228 (3d Cir. 1994), abrogated by McKennon, 115 S. Ct. 879 (1995), we distinguished an after-acquired evidence case by stating:

> What sets an after-acquired evidence case far apart from a mixed-motives case like Price Waterhouse or a pretext case like McDonnell Douglas is that the articulated "legitimate" reason, which was non-existent at the time of the adverse decision, could not possibly have motivated the employer to the slightest degree.  After-acquired evidence, simply put, is not relevant in establishing liability under Title VII or ADEA because the sole question to be answered at that stage is whether the employer discriminated against the employee on the basis of an impermissible factor at the instant of the adverse employment action.

Mardell, 31 F.3d at 1228.  Here, CNA's articulated reason (that Delli Santi allegedly inflated her gas receipts) was known to CNA at the time of the adverse action; indeed, CNA claims that it was the very reason for the discharge.  Delli Santi's alleged wrongdoing did not arise after the fact but, instead, allegedly motivated CNA to discharge her in the first instance.

This case is unlike the case where a different and legitimate reason for discharge is discovered by the employer after its adverse employment action for another reason as well.  Here, CNA's stated reason for Delli Santi's discharge, theft, was specifically rejected by the jury.  By its own findings, the jury expressed its disbelief that in the absence of a retaliatory motive CNA would have made the same decision to discharge Delli Santi.  Instead, the jury drew the opposite inference (based upon the evidence that CNA did not investigate, discipline or terminate any other employee who was reporting low gas mileage and CNA's internal memorandum stating that these drivers should be counseled) that Delli Santi would not have been discharged for stealing.  Accordingly, we will reinstate the jury's award of $152,266 representing Delli Santi's front pay.

IV.

Under the LAD, an employee can recover damages for pain and suffering. N.J. Stat. Ann. 10:5-3; Catalane v. Gilian Instrument Corp., 638 A.2d 1341, 1353 (N.J. Super. Ct. App. Div.), certif. denied, 642 A.2d 1006 (N.J. 1994). To recover these damages, an employee does not need to present either expert testimony or objective corroboration. See Rendine v. Pantzer, 648 A.2d at 245; see also Bolden v. Septa, 21 F.3d 29, 34 (3d Cir. 1994) (expert medical testimony is not required to prove damages for emotional distress in a case brought under 1983). We hasten to add, however, that "New Jersey courts have been careful to award such damages only in cases where the record demonstrates a `substantial basis for compensation.'" Abrams v. Lightolier, Inc., 841 F. Supp. 584, 593 (D.N.J. 1994) (quoting Castellano v. Linden Bd. of Educ., 400 A.2d 1182, 1184 (N.J. 1979)), aff'd, 50 F.3d 1204 (3d Cir. 1995).

Here, the jury awarded Delli Santi $300,000 for pain and suffering. The district court, however, conditionally granted CNA a new trial on damages if Delli Santi refused to accept a remittitur of the pain and suffering award from $300,000 to $5,000, reasoning that although "Delli Santi's testimony supported an award for pain and suffering it did not support one so large." Delli Santi, No. 88-5137, slip op. at 40-41.

Delli Santi argues that the district court overlooked substantial evidence when it concluded that her testimony did not support an emotional damage award "so large," id. at 41, namely, the humiliation and emotional damages flowing from the loss of her reputation. At trial Delli Santi testified that she was "terrified" to interview with prospective employers, "afraid" to network with people in the industry, and her social life nearly ceased to exist -- all because people might "find out" the alleged reason for her firing.

We stress our "severely limited" role in reviewing the question of whether the district court abused its discretion in remitting the pain and suffering award. We "may disturb the district court's determination with respect to a remittitur only for abuse of discretion, and reverse and grant a new trial only if the verdict is so grossly excessive as to shock the judicial conscience." Gumbs v. Pueblo Int'l., Inc., 823 F.2d 768, 771 (3d Cir. 1987) (internal quotes omitted); see also Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir. 1987) (court must "review a damage award to determine if it is rationally based"); Walters v. Mintec/Int'l., 758 F.2d 73, 82 (3d Cir. 1985) ("a district court should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds"). Our role is even more limited than the district court's; we must give "additional deference" where the district court has already granted a remittitur. Gumbs, 823 F.2d at 771. In undertaking our circumscribed role, here, we find that a review of jury verdicts in other cases may prove helpful, though not mandatory. Id. at 773.

In Abrams, for instance, the jury awarded an employee $100,000 in damages for emotional distress under the LAD based

upon his testimony that

> it had been a very upsetting thing to be
> accused in secret of bribery, to a company
> that you've worked for, without even the
> courtesy of being told about it.
>
> It has been very unnerving, unpleasant and
> distressing to have somebody tell you that
> you can't have a job because you are not up
> to it physically. . . . [a]nd I have really
> been very, very, very upset by the whole
> thing.

841 F. Supp. at 593 (alteration in original).  The district
court, however, ordered a remittitur, reasoning that, "[g]iven
the paucity of evidence regarding plaintiff's actual mental
distress," the award was grossly excessive to the extent it
exceeded $2,500.  Id. at 594.  See Jackson v. Consolidated Rail
Corp., 538 A.2d 1310, 1317 (N.J. Super. Ct. App. Div. 1988) ("the
severity of the distress from the testimony of the plaintiff
himself was not of such a degree to warrant the judgment of over
half a million dollars" in damages for emotional distress under
the LAD); Catalane, 638 A.2d at 1353 (court upheld trial court's
decision to grant new trial on damages under the LAD because
$250,000 award for emotional distress "shocked the conscience" of
the trial judge) (internal quote omitted).

Against this backdrop, we conclude that the district
court acted within the confines of its discretion in ordering a
new trial unless Delli Santi accepted a remittitur of $295,000.
Although Delli Santi testified about her distress, the district
court determined that Delli Santi's evidence of pain and
suffering did not support an award of $300,000.  Because we must
give deference to the judgment of the trial court who was "in the
best position to evaluate the evidence and assess whether the
jury's verdict [was] rationally based", Gumbs, 823 F.2d at 772
(quoting Murray v. Fairbanks Morse, 610 F.2d 149, 153 (3d Cir.
1979)), we cannot say that the district court exceeded the bounds
of its discretion in remitting the pain and suffering award from
$300,000 to $5,000.

                              V.
Finally, Delli Santi argues that the district court
should have submitted the issue of punitive damages to the
jury.  We exercise plenary review over the district court's
decision to deny Delli Santi's request to send the issue of
punitive damages to the jury.  Bonjorno v. Kaiser Aluminum &
Chem. Corp., 752 F.2d 802, 814-15 (3d Cir. 1984), cert. denied,
477 U.S. 908 (1986); Lightning Lube, 4 F.3d at 1167.

"The New Jersey Supreme Court has made clear that `[t]o
warrant a punitive award, the defendant's conduct must have been
wantonly reckless or malicious.  There must be an intentional
wrongdoing in the sense of an `evil minded act' or an act
accompanied by a wanton and willful disregard for the rights of
another.'"  Lightning Lube, 4 F.3d at 1192 (quoting Nappe v.

Anschelewitz, Barr, Ansell & Bonello, 477 A.2d 1224, 1230 (N.J. 1984)) (alteration in original); accord Jackson, 538 A.2d at 1319-20.  As we noted in Levinson, 868 F.2d at 563, however, "we do not suggest that in every employment discrimination case in which there is a basis for compensatory damages it follows that punitive damages are also available."  See Catalane, 638 A.2d at 1354 ("punitive damages are only to be awarded in exceptional cases even where the LAD has been violated"); Maczik v. Gifford Park Yacht Club, 638 A.2d 1322, 1326 (N.J. Super. Ct. App. Div.) ("Punitive damages . . . are distinct from compensatory damages, require a greater threshold basis, and are assessed only when the wrongdoer's conduct is `especially egregious.'"); Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1136 (D.N.J. 1990) ("plaintiff must show more than the minimum conduct necessary to prove the underlying [LAD claim] before an award of punitive damages becomes appropriate"); Lehmann v. Toys `R' Us, Inc., 626 A.2d 445, 464 (N.J. 1993) (punitive damages are to be awarded "when the wrongdoers conduct is especially egregious") (citing Leigruber v. Claridge Assocs., 375 A.2d 652 (N.J. 1977)).  Butsee Johnson v. Ryder Truck Rentals Inc., 624 A.2d 632, 635 (N.J. Super. Ct. Law Div. 1993) ("no proofs other than a violation of the [LAD] are required to warrant the imposition of punitive damages").  Although we conclude there is sufficient evidence to support the jury's verdict for compensatory damages, we do not perceive any basis to interfere with the district court's reasoning that there was a lack of evidence to submit the issue of punitive damages to the jury.

                              VI.
        For the foregoing reasons, we will reverse the district court's grant of judgment as a matter of law in favor of CNA and, in addition, reverse the district court's conditional grant of a new trial on liability issues.  We will affirm the district court's decision to grant a new trial on the issue of damages unless Delli Santi accepts the remittitur, but we will reinstate the jury's award of $152,266 representing damages for loss of future earnings.  On remand the district court should consider Delli Santi's motions for prejudgment interest and costs and attorney's fees.



Delli Santi v. CNA Insurance
Nos. 94-5331 and 94-5347


ALITO, Circuit Judge, concurring and dissenting.
        I concur in the judgment except insofar as it reinstates the jury's award of front pay.  I agree with the majority that a reasonable jury could have found that CNA would not have launched its investigation of the plaintiff's gasoline vouchers were it not for her complaints of discrimination.  Both the timing of the investigation and CNA's failure to investigate other employees who reported low gasoline mileage give rise to an

inference of retaliation. I recognize that, of the low-mileage employees, the plaintiff's record was apparently one of, if not the very, worst, and this is certainly a fact that I would have taken into account if I had been the trier of fact. Nevertheless, I think that, even assuming that the plaintiff bore the burden of persuasion with respect to the question whether retaliation was a determinative factor in the discharge decision (a question I discuss below), a reasonable jury could have found that it was.

A reasonable jury could not have found, however, that the plaintiff did not falsify her vouchers. Driving a compact car with an EPA-estimated gas mileage of 23 miles per gallon, she reported gas mileage, over a five-year period, that was far, far lower, reaching a nadir of three miles per gallon for one reporting period. She offered a host of excuses for her low mileage, but these were either inherently dubious or were discredited by CNA's investigation. For example, although the plaintiff suggested that her low mileage might be attributable to mechanical problems with her car (she said that the car "ran rough"), when the car was test driven it achieved 24 to 27 miles per gallon. Most damning was the plaintiff's submission of "receipts" for gas purchases that she herself wrote up. The mileage that she reported for particular periods was inversely proportional to the number of these suspicious "receipts" that she submitted. In 1984, when she submitted an average of two to three such "receipts" per expense period, her reported mileage was 11 to 13 miles per gallon. In 1985, she submitted an average of three to four such "receipts" per period, and her mileage sank to 10 miles per gallon. In 1986, when she averaged four such "receipts" per period, her mileage fell further to 7 miles per gallon. And finally, in 1987, when she reached an average of five such "receipts" per period, her mileage plummeted to 6 miles per gallon. As the district court observed, the proof of the plaintiff's pilfering was "overwhelming."

A reasonable jury likewise could not have found that CNA did not have a policy of firing employees who were proven to have stolen from the company. Employers do not routinely tolerate employees who are proven to have stolen from them; CNA offered evidence that it had a blanket policy of firing such employees; and I am aware of no direct evidence to the contrary. The majority suggests, however, that the absence of such a policy can be inferred from the fact that CNA approved the plaintiff's expense reports for some time without launching an investigation and the fact that CNA did not investigate other employees who reported very low mileage. This reasoning overlooks the important difference between the failure to investigate suspicious conduct, which may result from lax administrative controls, and the toleration of proven theft. Once the plaintiff was investigated, CNA was confronted with what the district court aptly described as "overwhelming" proof of her theft. In my judgment, a reasonable jury could not have inferred from CNA's failure to investigate suspicious conduct that it was CNA's policy to tolerate proven theft.

Because it is CNA's policy to fire employees, such as

the plaintiff, who are caught stealing from the company, the plaintiff is not entitled to reinstatement or front pay. In McKennon v. Nashville Banner Publishing Co., 115 S.Ct. 879 (1995), the Supreme Court held that an employer who discharges an employee for a discriminatory reason is liable under the federal Age Discrimination in Employment Act even though the employer discovers after the action is taken that it has a different, legitimate reason for the same action. The Court observed, however, that in such a case "as a general rule . . . neither reinstatement nor front pay is appropriate." Id. at 886. The Court explained: "It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." Id. I think that this teaching would be controlling here if this case rested on federal rather than state law.

The majority, however, facilely dismisses the teaching of McKennon as applicable only in "after-acquired" evidence cases, that is, cases in which the evidence of the legitimate reason for discharge is acquired after the adverse employment decision is taken. This reasoning does not seem to me to make any sense. Consider the following two cases. In Case A, which is analogous to McKennon, the employer discharges an employee for a discriminatory reason and then, when sued or threatened with suit, launches an investigation of the employee and discovers a legitimate reason for discharge. In Case B, which is comparable to this case, the same employer, acting with the same discriminatory motive, targets the same employee for investigation before firing him and then discovers, as a result of the investigation, the same legitimate ground for termination. In Case A, the employee, under McKennon, would not be entitled to reinstatement or front pay, and I cannot think of any good reason for treating the employee in Case B more favorably than the employee in Case A.

While McKennon is not directly controlling here because this case is based on the New Jersey Law Against Discrimination ("LAD") rather than federal anti-discrimination law, I think that the New Jersey Supreme Court would follow McKennon, see Miller v. Beneficial Management Corp., 855 F. Supp. 691, 715-17 (D.N.J. 1994); Massey v. Trump's Castle Hotel and Casino, 828 F. Supp. 314, 324 (D.N.J. 1993), or would adopt some related rule limiting a plaintiff's entitlement to reinstatement or front pay in cases where a legitimate reason for discharge is discovered after the employee is wrongfully terminated or targeted for investigation. (In an extreme case -- say, the investigation uncovers, not petty chiselling on expense vouchers, but massive embezzlement -- ordering reinstatement or front pay would be preposterous.)

One other aspect of the majority opinion bears comment. The majority appears to hold that the standards set out in Jamison v. Rockaway Township Bd. of Educ., 242 N.J. Super. 436, 445, 577 A.2d 177, 182 (App. Div. 1990), apply in all LAD retaliation cases. Jamison itself, however, takes pains to limit its holding to cases involving the failure to promote, see N.J. Super. at 446-47, 577 A.2d at 182-83 and the plaintiff argues strenuously that it does not apply here. While it may be

that the New Jersey Supreme Court will ultimately hold that Jamison governs all LAD retaliation cases, it has not done so yet, and I see no need for us to venture a prediction on this question, because I think that the result here would be the same whether Jamison applies or not.

Under Jamison, as I understand it, once the employer satisfies its burden of production under the second step of the McDonnell Douglas scheme, the plaintiff must then show that retaliation was a motivating factor in the challenged action, not that it was the sole or a determinative cause. Then, the burden of persuasion switches to the employer to prove by a preponderance of the evidence that retaliation was not a determinative cause.

Under the federal scheme, which I take it would apply if Jamison does not, see McKenna v. Pacific Rail Service, 32 F.3d 820 (3rd Cir. 1994), once the employer satisfies its burden of production under the second step of McDonnell Douglas, and assuming the case does not call for special treatment under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), it would then be up to the plaintiff to prove by a preponderance of the evidence, using direct or indirect proof, that retaliation was a determinative cause of the challenged action. See Miller v. CIGNA Corp., 47 F.3d 586, 598 (3rd Cir. 1995) (in banc). Thus, the difference between the two schemes concerns the allocation of the risk of non-persuasion on the question whether retaliation was a determinative cause. In this case, I think that whoever had that burden, the evidence was sufficient to prove that the investigation was begun for a retaliatory reason and was thus a determinative cause of the plaintiff's termination. Accordingly, it seems to me to be both unnecessary and imprudent for this panel to make a prediction on this point.