**Gene A. WATKINS, Plaintiff,**

v.

**NABISCO BISCUIT COMPANY, and Philip Mancini, Defendants.**

**No. CIV.A. 99–4336(JAG).**

United States District Court,
D. New Jersey.

Sept. 26, 2002.

H. Thomas Hunt, III, Cureton Caplan Hunt Scaramella & Clark, P.C., Cherry Hill, NJ, for Plaintiff.

John J. Peirano, David Cohen, Carpenter, Bennett & Morrissey, Newark, NJ, for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion of Defendants Nabisco, Inc. ("Nabisco")[1] and Philip Mancini ("Mancini") (collectively, "Defendants") for summary judgment as to each of Plaintiff Gene Watkins' ("Watkins" or "Plaintiff") five claims. Plaintiff, a former employee of Nabisco, alleges the following claims against Defendants: racial discrimination (pursuant to Title VII, the New Jersey Law Against Discrimination ("LAD"), and 42 U.S.C. § 1981); and retaliation (pursuant to Title VII and the LAD). For the reasons set forth below, this Court finds that Plaintiff has failed to establish prima

1. Nabisco is incorrectly named in the Complaint as "Nabisco Biscuit Company." (Defs.' Br. at 1.)

facie cases of racial harassment, discriminatory discharge, or retaliation. Additionally, this Court finds that Watkins has not produced evidence tending to establish that Defendants' proffered legitimate, nondiscriminatory reasons for terminating Plaintiff were pretexts for racial discrimination. Accordingly, Defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56(c), is granted.

## RELEVANT FACTS[2]

Watkins, an African–American male, was employed by Nabisco as a Senior Process Control Engineer in its East Hanover, New Jersey facility from July, 1995 until his termination on January 22, 1998. (Defs.' Rule 56.1 Statement ¶ 1.) Watkins' starting compensation included a base salary of $71,500 and a one-time hiring bonus of $8,000. (David Cohen Aff., Ex. G.) As Senior Process Control Engineer, Watkins was responsible for the design and implementation of manufacturing and process control systems at the Nabisco bakeries. (Pl.'s Rule 56.1 Statement of Facts ¶ 4.) Watkins reported directly to Mancini, a Manager in the Process Controls Division of Nabisco. (Pl.'s Rule 56.1 Statement ¶ 11; Defs.' Rule 56.1 Statement ¶ 3.) Shortly after Watkins began working at Nabisco, Mancini took sick leave and did not return to work full time until March, 1996. (Pl.'s Rule 56.1 Statement ¶ 13;

Defs.' Rule 56.1 Statement ¶ 14.) Donald Boyle ("Boyle"), a Senior Director in the Process Controls Division-and Mancini's supervisor-oversaw Watkins' work during Mancini's absence. (Pl.'s Rule 56.1 Statement of Facts ¶¶ 12–13; Defs.' Rule 56.1 Statement ¶ 16.) Boyle could not recall any problems with the quality of Watkins' work product during Mancini's absence. (Boyle Dep. at 46–48.)

Plaintiff received his first written annual performance review by Mancini in July, 1996. (Defs.' Rule 56.1 Statement ¶ 17; Pl.'s Rule 56.1 Statement ¶ 18.) Nabisco's evaluation process contains three steps: (1) employees first complete a written self-evaluation, which is submitted to the employee's immediate supervisor; (2) the supervisor then completes a written evaluation, incorporating any insight provided by the self-evaluation; and (3) the employee and supervisor meet to discuss both evaluations and any inconsistencies therein. (Defs.' Rule 56.1 Statement ¶ 18.) Watkins evaluated himself at the "commendable" level, the equivalent of an above average rating.[3] (Cohen Aff., Ex. K.) On the other hand, Mancini rated Watkins as "effective" overall, the equivalent of an average rating. (Cohen Aff., Ex. I.) Mancini gave Watkins a "commendable" rating in two of the six categories. (*Id.*) As part of his evaluation, Mancini also noted several "objectives and goals" for Watkins, in-

---

**2.** This Court's recitation of the facts draws heavily from the relevant statements of material facts, submitted by the parties in accordance with L. Civ. R. 56.1.

**3.** Defendants argue that Watkins' self-evaluation, dated June 20, 1996, was submitted to Mancini beyond the applicable deadline, and thus was not considered by Mancini in Watkins' performance review. (Defs.' Rule 56.1 Statement ¶ 91; Cohen Aff., Ex. K.) Additionally, Defendants emphasize that Watkins' self-evaluation is devoid of any expressed concern regarding the lack of support from co-workers or management. (Defs.' Rule 56.1 State-

ment ¶¶ 28–29.) In fact, in the section entitled "Project Management," Watkins states that he has "[m]aintained a sense of comradery [sic] among all projects' team members as well as the plant." (Cohen Aff., Ex. K.) Despite Watkins' allegations regarding the poor communication between he and his team workers, no such reference is made in the "Communication" section of the memorandum. (*Id.*) In fact, in the "Performance Summary" section, Watkins urges that he has been able to do a commendable job on the Line 9 project due to "teamwork and patience." (*Id.*)

cluding "communication skills, self-improvement skills, and leadership skills." (*Id.*) At the meeting following the written evaluation,[4] Watkins informed Mancini that he was not receiving the same level of assistance as other project team members. (Watkins Dep. at 169–70.) However, Watkins did not mention these problems in his written self-evaluation. (*Id.* at 170.)

On October 19, 1996, Mancini wrote a memorandum to Boyle summarizing Watkins' concerns about several incidents that Watkins felt had impacted his work performance.[5] (Cohen Aff., Ex. M). Mancini informed Boyle that he had already taken several steps in response to Watkins' complaints: (1) informing the three individuals that had engaged in the allegedly discriminatory behavior that such behavior was inappropriate;[6] and (2) following up with Watkins, who later revealed that "attitudes toward him had improved." (Cohen Aff., Ex. M.)

On November 9, 1996, Boyle forwarded Mancini's memorandum to Margaret Campos ("Campos"), a manager in Nabisco's Human Resources Department, with copies sent to David Mathews ("Mathews"), also a manager in Human Resources, and

Howard Leibowitz ("Leibowitz"), a Vice President in the Engineering Department. (*Id.*, Ex. S.) Five days later, Boyle wrote to Leibowitz stating that "[w]e continue to be dissatisfied with the performance of Gene Watkins." (*Id.*, Ex. T.) Boyle informed Leibowitz that Mancini was taking the following actions to address Watkins' perceived deficiencies:

[1] Give [Watkins] a new assignment that requires that he perform at the Senior Engineer level, give him all the help he needs in getting the project organized, and then rate his performance in executing his assignment. [and]

[2] Prepare a half year performance appraisal in January to formalize a record of his performance, good or bad... (*Id.*)

On December 6, 1996, Watkins wrote a memorandum to Mancini memorializing the difficulties he had encountered with his co-workers. (*Id.*, Ex. N.) Watkins' allegations—described generally in Mancini's earlier memorandum-can be summarized as follows: (1) the theft of Watkins' Ebony Fashion Fair calendar;[7] (2) disparaging comments by Watkins' co-workers;[8] (3)

---

4. The parties' statements of facts do not specify when the review meeting occurred, although based on the timeline presented, it appears to have taken place between July, 1996 and October, 1996.

5. It is important to note that at that time, Nabisco had no formal policy for addressing claims of employment discrimination. (David Mathews Dep. at 53.) Generally, once a complaint was made to a supervisor, that supervisor was required to notify someone in Human Resources. (*Id.*) Human Resources was then responsible for informing Nabisco's Affirmative Action/EEO and Legal Departments. (*Id.*) According to Nabisco's "Equal Employment Opportunity and Affirmative Action Brochure," discrimination complaints will be investigated on a "confidential and need to know basis." (Pl.'s Ex. L.)

6. Mancini did not identify the three individuals by name in his October 19, 1996 memorandum. (Cohen Aff., Ex. M.)

7. Watkins claimed that in June or July 1996, Adam Subsinsky ("Subsinsky") turned his Ebony Fashion Fair calendar to the wall "so that he wouldn't have to look at black faces," and then subsequently removed his calendar. (*Id.;* Compl. ¶ 16.)

8. Specifically, Watkins claimed that Ted Carvalho ("Carvalho") had "talked-down to [him] using profanity and statements like, "my boy," "My son," and "people like you." (*Id.*, Ex. N.) Watkins also claimed that Russell Lomauro ("Lomauro") had called him "incompetent" in conversations with his co-workers, and that Subsinsky routinely approached Watkins with such disparaging comments as, "So you are the special engi-

the disruption of Watkins' work area;[9] and (4) the lack of cooperation from Watkins' team members.[10] After receiving Watkins' memorandum, Mancini again spoke with the alleged offenders. (Defs.' Rule 56.1 Statement ¶ 67; Pl.'s Rule 56.1 Statement ¶ 80.) In early 1997, Mooney and Subsinsky, two of Watkins' co-workers, submitted written responses specifically denying Watkins' allegations.[11] (Cohen Aff., Exs. O, R.)

During 1995 and 1996, Watkins was assigned to work on the Line 9 Project in Atlanta, Georgia and Mancini's oversight of Watkins' job performance increased. (Defs.' Rule 56.1 Statement ¶ 69.) Mancini's and Boyle's increasing concern as to Watkins' work performance was reflected in Watkins' March 1997 performance evaluation. (Cohen Aff., Ex. U.) Watkins' overall rating dropped from "effective," to "developmental," the equivalent of a below average rating. (Id.) Specifically, Mancini remarked:

> Since July, I have made a point of spending a great deal of time with [Watkins] to be sure that he understood my expectations, that he knew how to do the things I wanted him to do, and to insure

that I was getting a clear view of his skills.

> Gene has not demonstrated that he possesses sufficient knowledge of the responsibilities of a senior process control engineer to achieve an Effective rating. Over the past six months, reports and documents have not been delivered in a timely fashion. Presentations lacked sufficient information and contained inaccuracies. He is not proficient with computer programs such as WORD, EXCEL or PowerPoint.

> A senior process control engineer must be self directed and a problem solver. [Watkins] has not demonstrated those skills. Overall, I feel that he must improve substantially before he is performing at an acceptable level. (Cohen Aff., Ex. U.)

In April, 1997, Mancini informed Watkins as to those areas in which Mancini felt Watkins needed improvement. (Defs.' Rule 56.1 Statement ¶ 81.) Two months later, in June 1997, Boyle updated Leibowitz on Watkins' performance. (Cohen Aff., Ex. V.) In his memorandum, Boyle mentioned a May 28, 1997 meeting with Mancini and Watkins regarding Watkins' recent

---

neer that's taking over the project from Paul M." (Id.) Finally, Watkins claimed that, on more than one occasion, he was verbally assaulted by Carvalho and Paul Mooney ("Mooney"). (Id.)

9. Watkins claimed that in addition to the removal of his calendar, his work area was violated in several other ways: the statement "faggot go home" was left on his desk; and his computer and office space were continually dismantled. (Id.) Watkins later testified that in or about February 1996, he also received a dollar-bill with the words "weird bird" written on it, and in December 1996, he found a plastic hatchet and scalpel in his mailbox. (Watkins Dep. at 274–75; Compl. ¶¶ 17–18.) Plaintiff never produced any evidence of these items; nor could Watkins' coworkers corroborate Plaintiff's allegation that he had received these items.

10. Watkins claimed that Mooney, Lomauro, Subsinsky, and Carvalho denied Watkins access to copies of project files or other important company information that was necessary to Watkins' job performance. (Id.)

11. Mooney's letter is dated January 21, 1997. (Id., Ex. R.) Comparatively, Subsinsky's memorandum is dated September 2, 1997. (Id., Ex. O.) However, on Subsinsky's memorandum, "September 2, 1997" is circled, and "Jan '97" is handwritten above the date. (Id.) In addition, Subsinsky writes that his letter is in response to a discussion with Mancini during the week of January 6, 1997. (Id.) Accordingly, this Court assumes, for purposes of the instant matter, that Subsinsky's response was forwarded to Mancini in January 1997, as opposed to September 2, 1997.

performance review. (*Id.*) Boyle also mentioned Watkins' discrimination complaints: "[Watkins] acknowledged that he knew...Mancini had reported the original incidents and that all of the engineers involved had been counseled by their supervisors...[h]owever, [Watkins] stated that he still didn't think...[Mancini] and I had taken the situation seriously." (*Id.*) Moreover, Boyle reported that Watkins' reassignment to work with a different group of peers had not improved Watkins' performance level. Although Boyle considered Watkins to be in the "developmental" category, he nonetheless "asked [Mancini] to continue to work with [Watkins] on completion of his required tasks and to reinforce the message to the Atlanta project team that [Watkins] should be given the opportunity to lead that effort unimpeded by others." (*Id.*)

On or about September 8, 1997, Nabisco placed Watkins on a 90–day corrective action plan. (Cohen Aff., Ex. W.) Watkins was given eight key areas in which to make improvements. (*Id.*) On September 29, Watkins met with Mancini, Boyle, and Leibowitz to give them a further opportunity to explain their expectations of Watkins during the 90–day plan. (Cohen Aff.,

Ex. J.) That same day, Watkins wrote a memorandum to Mancini detailing his disagreement with Mancini's assessment of Watkins' performance in both his March 1997 performance review and the 90–day corrective action plan. (*Id.*, Ex. X.) Watkins voiced his concern that communications with, and support from, management had broken down after Watkins' December 1996 memorandum. (*Id.*)

On November 7, Watkins met with Mancini, Boyle, and Mathews to discuss the eight point corrective action plan.[12] (*Id.*, Ex. Z.) Boyle documented this meeting in his November 10, 1997 memorandum to Watkins. (*Id.*) During the meeting, Watkins was provided with sample project lists and schedules and was required to review his progress with Mancini on a bi-weekly basis. (*Id.*) Nonetheless, Mancini perceived that Watkins' performance continued to deteriorate. In early 1998, Mancini outlined Watkins' continued failure to meet the requirements of the corrective action plan and recommended Watkins' termination.[13] (*Id.*, Ex. BB.) As a result, Nabisco terminated Watkins, effective January 31, 1998. (*Id.*, Ex. CC; Pl.'s Rule 56.1 Statement ¶ 112.) Initially, Mancini assumed Watkins' job responsibilities.

12. Watkins secretly recorded both the September 29, 1997 and November 7, 1997 meetings. (Cohen Aff., Ex. AA.) However, rather than exposing a scheme to undermine Watkins' ability to perform his duties adequately, the dialogue between the parties reveals Mancini's painstaking attempts to inform Watkins as to the areas needing improvement and to advise Watkins on how to address any future attempts by his team members to circumvent his authority. (*Id.*) For example, in reviewing-item by item-the problem areas enumerated by Mancini in Watkins' September 9, 1997 Performance Review, the parties discuss item number 3: "Failure to follow the Process Control Systems group software change request procedure." (*Id.*, Ex. W, AA at 11.) Watkins explains that one of the reasons he has struggled to record every change request is because various co-workers would "refuse

to write them and...would completely bypass me and go to the programmers and tell them what they wanted them to do." (*Id.*, Ex. AA at 20.) Mancini responds that "[t]he only thing with that is you gotta control the software person. You gotta tell him if you do a change without my authorization, you're not going to be here anymore. I'm going to get somebody else to make sure it happens." (*Id.* at 21.) Similarly, Leibowitz offers that "you [then] need to put... Phil [Mancini] in the middle and send him off talking to [these co-workers] and just say it's not acceptable. Sometimes you gotta push back." (*Id.*)

13. One cited example of Watkins' deficiencies were the mathematical errors in Watkins' budget reports. (Defs.' Rule 56.1 Statement ¶ 98; Cohen Aff., Ex. BB.)

(Defs.' Rule 56.1 Statement ¶ 100.) In 1999, Nabisco transferred Denard Graver, an African–American, from its Richmond, Virginia bakery into the position of Supervisory Process Control Engineer at its East Hanover, New Jersey facility. (*Id.*) Graver assumed Watkins' job responsibilities. (*Id.*)

## STANDARD OF REVIEW

### A. FED. R. CIV. P. 56(c)

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences-including on issues of credibility-in favor of the non-movant. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994); *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir.1992); *Watts v. Univ. of Del.*, 622 F.2d 47, 50 (3d Cir.1980).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990); *see also* FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). In the employment discrimination context, "a trial court must be cautious about granting summary judgment to an employer when... its intent is at issue." *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (citing *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994)).

### B. Allocation of burden in employment discrimination context

In proving that he was subject to unlawful discrimination, Watkins may present either direct or indirect evidence. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 n. 4 (3d Cir.1999).

#### 1. Mixed motives theory

Often, where a plaintiff possesses some direct evidence of discrimination, he seeks to prove the defendant's liability under a "mixed motives" theory. A claim under the "mixed motives" theory requires "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir.1995)

(quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Conner, J., concurring)). Plaintiff must therefore show "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." Id. (citation omitted). Conversely, "stray remarks in the workplace, while perhaps probative of a discriminatory animus, cannot justify requiring the employer to prove that its employment decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard..." Id. (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775).

■ Where a plaintiff has produced direct evidence of discrimination, however, "it is not necessary to rely on any presumption from the prima facie case as is necessary in a pretext action." *Id.,* (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994)).

> [If] the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was a substantial motivating factor in that decision. If the finder of fact concludes that the plaintiff has carried this burden, the burden of persuasion shifts to the defendant to prove that the unlawful motive was not a but-for cause, i.e., that the same action would have been taken, because of legitimate considerations, in the absence of a lawful motive. *Wilson v. Susquehanna Township*

*Police Dept.,* 55 F.3d 126, 129 (3d Cir. 1995) (citing *Miller v. CIGNA Corp.,* 47 F.3d 586, 594 (3d Cir.1995) (en banc)). Thus, where a plaintiff in a mixed motives case has demonstrated that his race played a part in an employment decision, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [race] into account." *Id.,* (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775).

### 2. Pretext theory

■ Comparatively, where a plaintiff alleges a "pretext" case of discrimination, he need not produce direct evidence of discrimination.[14] Rather, a pretext case "depends on circumstantial evidence allowing the factfinder to infer that the falsity of the employer's explanation shows bias." *Starceski,* 54 F.3d at 1097–98. Thus, in a "pretext" case, plaintiff must first make a prima facie showing of discrimination. *Id.* Under both Title VII and LAD jurisprudence, "the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089.

"[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection....[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253, 101 S.Ct. 1089;

---

14. Of course, a plaintiff may bring discrimination charges under *both* the "pretext" and "mixed motives" theories: "an employee need not elect to proceed on either a pretext or a *Price Waterhouse* theory at trial. Rather, we think that an employee may present his

case under both theories and the district court must then decide whether one or both theories properly apply at some point prior to instructing the jury." *Starceski, infra,* 54 F.3d at 1098 (citing *Armbruster, infra,* 32 F.3d at 782 n. 17).

*Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *See also Baxter v. AT & T Communications*, 712 F.Supp. 1166, 1172 n. 2 (D.N.J.1989) (recognizing that the New Jersey Supreme Court has adopted the *McDonnell Douglas* burden shifting analysis and applied it to claims brought under the NJLAD).

█ It is important to note, however, that "the prima facie case under *McDonnell Douglas–Burdine* pretext framework is not intended to be onerous. The prima facie case merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728–29 (3d Cir.1995) (en banc) (citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

█ Nonetheless, at the summary judgment stage, the burden of persuasion rests with Nabisco as movant. *See Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 202 (3d Cir.1987). "To meet its burden on summary judgment, the defendant employer must show that the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate, or indi-

rect evidence of that purpose by showing that the proffered reason is subject to factual dispute." *Id.* at 203 (citing *Chipollini v. Spencer Gifts*, 814 F.2d 893, 898–900 (3d Cir.1987)).[15]

█ A plaintiff must therefore provide proof of "pretext-*only*." That is, where a plaintiff has introduced evidence sufficient to discredit the defendant's proffered reasons, he "need not also come forward with additional evidence beyond his or her prima facie case" in order to survive summary judgment. *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 495 (3d Cir.1995) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)) (rejecting the "pretext-*plus*" standard requiring plaintiffs to demonstrate 'both that the employer's reasons are false and that the real reasons were discriminatory.') Accordingly, "a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Waldron*, 56 F.3d at 495 (citing *Fuentes*, 32 F.3d at 764).[16]

## ANALYSIS

### A. Plaintiff's Mixed Motives Theory

█ As noted above, in order to maintain a claim successfully for racial discrimination under a "mixed motives" theory, Watkins must demonstrate "conduct or statements by persons involved in the decisionmaking process that may be viewed as

---

**15.** Although *Sorba* involved an ADEA claim, it is undisputed that "the LAD and ADEA 'are governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*' " *Waldron*, 56 F.3d at 503 (citing *Erickson v. Marsh & McLennan Co.*,

117 N.J. 539, 569 A.2d 793 (1990) and *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 538 A.2d 794 (1988)).

**16.** *Baxter v. AT & T Communications*, 712 F.Supp. 1166, 1171 (D.N.J.1989).

directly reflecting the alleged discriminatory attitude." *Starceski,* 54 F.3d at 1096. In support of a mixed motives analysis, Plaintiff points to a "secret file" on Watkins, which Mancini maintained. (Pl.'s Br. at 14.) The "secret file" was a three-ring binder in which Mancini testified that he kept Watkins' evaluations and memoranda related to the investigation of Watkins' complaints. (Mancini Dep. at 163–64.) Plaintiff claims that because no similar documentation had ever before been compiled about an employee, the file constitutes evidence that Watkins was treated differently than other employees. (Pl.'s Br. at 24.)

To the contrary, this Court is unwilling to find that the file demonstrates direct evidence of Mancini's racial animus towards Watkins. Watkins does not argue that the creation of the file, itself, is unusual where an employee makes complaints of discrimination or has performance problems. (*See e.g.,* White Dep. at 44–47.) Similarly, Watkins does not allege that the actual contents of the file disclose any racial animus on the part of any Nabisco employee. In fact, at oral argument, Watkins admitted that he possessed no direct evidence that either Mancini or Boyle—the two decisionmakers alleged to have played a role in his employment conditions—harbored racial animus against Watkins. (Tr. at 23; 29.) [17]

Accordingly, this Court finds that Mancini's file on Watkins does not constitute direct evidence of discriminatory attitude in support of a "mixed motives" analysis.

*See e.g., Fuentes v. Perskie,* 32 F.3d 759, 766 (3d Cir.1994) ("Given the frequency of employment discrimination suits, an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than devious. Absent evidence providing an independent reason to suspect the act, the documentation of the reasons for rejecting an applicant is insufficient, in and of itself, to give rise to a reasonable inference of discriminatory motive.")

As such, this Court concludes that Plaintiff has not produced evidence of direct discrimination sufficient to proceed under a mixed motives theory. Watkins' claims will therefore be analyzed as a "pretext" suit under the burden shifting framework outlined in *McDonnell Douglas, supra,* and *Burdine, supra.*

### B. Racial Harassment

▬ To establish a prima facie case of racial harassment under the LAD, Watkins "must demonstrate that the defendant's conduct (1) would not have occurred but for [his] race; and the conduct was (2) severe or pervasive enough to make a(3) reasonable African–American believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685, 688–89 (1998) (citations omitted). The "severe or pervasive" test also "conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law." [18] *Id.* at 689 (citing *Meritor Sav. Bank v.*

---

17. As to Mancini, H. Thomas Hunt III ("Hunt"), attorney for Watkins, stated "No, I don't have any direct evidence of any racial animus by Mr. Mancini, correct." (Tr. at 29.) Hunt also admitted "...Mr. Boyle helped Mr. Watkins. I deposed Mr. Boyle myself. I don't believe Mr. Boyle has a racist bone in his body." (Tr. at 23.)

18. Specifically, Title VII is violated "[w]hen the workplace is permeated with discrimina-

tory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of

*Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Under the severe or pervasive standard, "one incident of harassing conduct can create a hostile work environment." *Id.* (citing *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445, 455 (1993)). Nonetheless, "while it is 'certainly possible' that a single incident, if severe enough, can establish a prima facie case of a hostile work environment, 'it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable person situated as the claimant, make the working environment hostile.' " *Id.* (citing *Lehmann*, 626 A.2d at 455).[19]

 In support of his racial harassment claim, Watkins argues that the fol-

lowing facts constitute evidence of Defendants' severe or pervasive conduct: (1) the turning around and ultimate removal of Plaintiff's Ebony Fashion Fair calendar by co-worker Subsinsky; (2) the placement of a plastic hatchet and scalpel in Watkins' mailbox, and three-dollar bills marked with the words "weird bird" and "faggot go home" on his desk; (3) the withholding of information by Watkins' team workers; (4) the failure to include Watkins in company meetings; and (5) the contravening of Watkins' authority by allowing his subordinates to make decisions that were the responsibility of Watkins. (Pl.'s Br. at 6–9.)

Under the first element, Watkins must show that the above conduct would not

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. Because the requirements for a hostile work environment claim are nearly identical under Title VII and the LAD, this Court's analysis applies equally to both Watkins' Title VII and LAD claims. *Cardenas*, 269 F.3d 251, 263 (3d Cir.2001)("The elements of [a LAD hostile work environment] claim closely resemble the first four elements of the Title VII hostile work environment claim.")

19. "Usually, repeated racial slurs must form the basis for finding that a hostile work environment has been created." *Taylor*, 706 A.2d at 689. "Generally, [the] mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* at 690 (citations omitted). Still, although actionable conduct may be both severe or pervasive, it is important to note that "only one of the qualities must be proved in order to prevail." *Id.* (quoting *Nadeau v. Rainbow Rugs*, 675 A.2d 973, 976 (Me.1996)). "The connotation of the epithet itself can materially contribute to the remark's severity...The meaning of a racial epithet is often a critical, if not determinative, factor in establishing hostile work environment." *Id.*

In evaluating whether a remark is severe, courts thus look to its dictionary and commonplace meanings. *Id.* at 691. The severity of a remark is also exacerbated when uttered or sanctioned by a supervisor or superior. *Id.* at 691–92. Importantly, in evaluating defendants' motion, this Court must keep in mind that "[i]t is the harasser's conduct, not the plaintiff's injury...that must be severe or pervasive." *Id.* at 692 (citations omitted). Moreover, "[s]everity and workplace hostility are measured by surrounding circumstances." *Id.*

In the instant case, Watkins does not appear to argue that Mancini or any of his colleagues uttered racial slurs or epithets that alone can form the basis of a racial harassment claim. (Pl.'s Br. at 7.) Nonetheless, this Court notes that, by the standards articulated above, the racial conduct alleged by Watkins-including Subsinsky's statement that he did not "want to look at black faces," the plastic hatchet and scalpel, or the three-dollar bills marked with "faggot go home" and "weird bird"-is not on its face so severe as to create a cause of action under Title VII or the LAD. *Cf. Taylor*, 706 A.2d at 692 (finding that plaintiff had presented sufficient evidence of 'severe and pervasive' behavior where supervisor called plaintiff 'jungle bunny' on one occasion).

have occurred but for his race. *See Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 605, 626 A.2d 445 (1993). Obviously, where conduct is clearly racial or racist in nature, the causal element will be satisfied. *Id.* In the instant case, only Plaintiff's first two allegations are arguably racial in nature. Nonetheless, Watkins may demonstrate that the remaining actions by his colleagues would not have occurred but for his race by showing that such facially neutral conduct was accompanied by conduct that was obviously racial or, in the alternative, that only Blacks suffered the facially neutral conduct. *Id.* Watkins does not specify which, if any, of these alternatives he relies upon. However, construing the evidence in a light most favorable to Plaintiff, this Court finds that the Ebony Fashion Fair calendar incident—the only obviously racial incident alleged by Plaintiff—combined with allegations of Defendants' facially neutral conduct, satisfies the causal element of Plaintiff's prima facie racial harassment case.

Nonetheless, Watkins has not demonstrated, by a preponderance of the evidence, that such conduct was so severe or pervasive as to be actionable under Title VII or the LAD. In evaluating whether an environment is sufficiently hostile or abusive, the Supreme Court has directed courts to "look[ ] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citations omitted). Moreover, the Court has emphasized that

simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing. We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment... *Id.* at 788, 118 S.Ct. 2275 (internal citations omitted).

In light of the above standards, it is clear that Watkins has not produced evidence of severe or pervasive conduct.

First, most of the allegedly hostile actions taken by Defendants are not overtly racial in nature. Moreover, even though a Title VII hostile environment claim may be founded on indirect evidence of subtle forms of discrimination, Watkins has produced no evidence that the facially neutral conduct of his supervisors and co-workers masked a discriminatory intent. *See Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir.2001) ("[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim.")

As noted earlier, Watkins has produced no evidence of racial animus on the part of Mancini. (Tr. at 29.) However, Watkins argues that two black co-workers, James Frederick ("Frederick") and Larry White ("White"), witnessed the racial animus towards Watkins and racial minorities in general.[20] But even here, Watkins' evi-

---

**20.** In the Complaint, Plaintiff also alleges that another, unnamed Nabisco employee told Watkins that she had "observed racial bias in Nabisco's treatment of Watkins and that she had reported her observations to Nabisco

dence is weak. For instance, Watkins highlights Frederick's deposition testimony that one of Watkins' co-workers, Carvalho, used Watkins' race against him. In context, however, Frederick's testimony is not persuasive: "[Carvalho] used to like to use the phrase "boys," "you people." He would use those type phrases, but I've heard him use them with other people in the trailer also, because most of the process group was in the trailer, so to single him out and say, Yeah because I'm African American he's using these phrases, that may be the way I feel, but I can't prove it." [21] (Pl.'s Ex. F at 48.)

Similarly, White noted that he had complained to management about a "racially negative" joke made by co-worker Mooney and admitted that such jokes were not a "big part" of Nabisco culture, and that he never heard Mancini or any other supervisor utter such jokes. (Pl.'s Ex. E. at 54–59; 93.) White further admitted that once he reported Mooney's comment to Mancini, Mancini spoke with Mooney, and the inappropriate behavior was never repeated. (*Id.* at 55–59.)

Watkins' own testimony is also unpersuasive. For example, Watkins testified that Mancini would often make "off-color comments" targeting "Polacks" or "Asian Americans," but not Blacks: "I don't know that I heard Mr. Mancini, in my presence at least, say any specific racist comments about African–Americans." (*Id.*, Ex. A. at 128–132.) Watkins could not provide any specific examples of the "off color" jokes or offensive language that Mancini allegedly used.[22] (*Id.* at 129.)

Watkins's reliance on a few racial jokes—the most clearly documented of which have occurred *outside* of Watkins' presence—to imply that Nabisco's facially neutral conduct masked discriminatory intent is misplaced. *Compare Cardenas,* 269 F.3d at 261–63 (summary judgment on plaintiff's hostile work environment claim precluded where plaintiff produced evidence of overtly racial comments as well as several forms of facially neutral mistreatment).

In fact, Watkins' evidence falls short of demonstrating that he suffered more than the "ordinary tribulations of the workplace" not protected by Title VII. Considering the evidence in its totality, this Court concludes that Plaintiff has failed to show that Defendants' conduct was so severe or pervasive to make an African–American believe that his .work conditions were somehow altered or that his environment was hostile. This Court therefore grants Nabisco's motion for summary judgment as to Watkins' racial harassment claim.

### C. Racial discrimination (discriminatory discharge)

■ To establish a prima facie case of discriminatory discharge under Title VII, Watkins must show: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he was discharged; and (4) that other employees not in a protected class were treated more favorably. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632 (3d Cir.1993); *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 342 (3d Cir.1990) (ADEA and

---

management." (Compl.¶ 36.) However, Watkins does not proffer any evidence supporting, or elaborating upon, this allegation.

**21.** It should also be noted that Watkins only worked briefly with Carvalho. Carvalho was a contractor working as a project manager in Atlanta on Watkin's first project. (Tr. at 9.) By the end of 1995–five months after Plaintiff

joined Nabisco–Carvalho was gone. (*Id.* at 9–10.)

**22.** This Court notes that even if Mancini had made "off-color comments" about other racial or ethnic groups, Watkins has not provided evidence tending to prove that such statements constitute a prima facie case of a hostile environment claim.

LAD case). Defendants charge that Watkins has not made out a prima facie case of discriminatory discharge. Specifically, Defendants claim that Watkins has failed to establish the second and fourth elements of the prima facie case. (Defs.' Br. at 18.) Alternatively, Defendants maintain that even if Watkins has made out a prima facie case of discriminatory discharge, they have produced undisputed evidence that Watkins was discharged for legitimate, nondiscriminatory reasons. (*Id.* at 19–20.)

First, Defendants argue that Plaintiff cannot establish that he was qualified for the position since "he clearly was not performing his position at a level that satisfied the employer's legitimate expectations." (Defs.' Br. at 18.) Specifically, Defendants argue that Watkins' "work product contained numerous deficiencies and despite the undisputed evidence that defendants notified plaintiff of these deficiencies and advised him of the consequences of his poor performance, plaintiff's performance did not improve." (*Id.*) This argument, however, is more appropriately addressed under Defendant's rebuttal to Plaintiff's prima facie case.

■ Defendants also claim that Watkins cannot satisfy the fourth element of the prima facie case. Defendants maintain that their eventual transfer of another African American employee, Denard Grover, into Watkins' position precludes Plaintiff from proving element four.[23] (Defs.'Br. at

18.) The Third Circuit, however, has cautioned that "a plaintiff's inability to prove that [he] was replaced by someone outside of [his] class is not necessarily inconsistent with [his] demonstrating that the employer treated [him] less favorably than others because of [his] race, color, religion, sex, or national origin." *Pivirotto,* 191 F.3d at 353 (internal citations omitted). Thus, although assigning Grover to assume Watkins' duties does hold some evidentiary weight, it does not completely absolve Defendants of liability. *See id.* at 354.

■ Regardless, under the *McDonnell Douglas–Burdine* "pretext" analysis, Watkins must still show by a preponderance of the evidence that other employees who were not African–American were treated more favorably. In support of the fourth element, Watkins alleges: (1) that he was subject to requirements and discipline no similarly-situated Caucasian employee suffered; and (2) that Mancini engaged in publicly abusive behavior towards Watkins that was not directed at Caucasian engineers. (Pl.'s Br. at 13.)

For example, Watkins argues that his load was heavier than Caucasian engineers because the support staff available to Caucasian engineers was taken away from Watkins. (Pl.'s Rule 56.1 Statement ¶ 47.) Watkins alleges that although he was initially assigned two supporting engineers, they were subsequently removed without replacements. (*Id.*) As evidence of this

---

**23.** Defendants point to *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1066 n. 5 (3d Cir.1996), in support of their argument that element (4) of the prima facie case requires that Watkins also show that his position "was ultimately filled by a person not of the protected class." However, in *Pivirotto,* supra, the Third Circuit held that "[r]equiring a gender-discrimination plaintiff prove she was replaced by a man...eliminates no common, lawful reasons for the discharge," and was not contemplated by the Supreme Court in constructing the *McDon-*

*nell Douglas* burden shifting framework for analyzing Title VII claims. 191 F.3d at 352–53. The Third Circuit noted that such "reasoning applies equally in the gender or race context." 191 F.3d at 355. The Third Circuit specifically distinguished its footnote in *Sheridan,* noting that its description of discriminatory discharge elements in that context was not a "holding," but dictum. *Id.* at 356. Accordingly, Watkins' is not required to show-and arguably, based on the facts before us, could not show-that he was replaced by a non-African American.

claim, Watkins points to his September 29, 1997 memorandum, in which he told Mancini that his problems with "Project Management" were in part based on Nabisco's failure to provide him "one or two people to assist with specification writing and project follow-up." (Cohen Aff. Ex. X at 3.) Watkins provides no evidence that he raised this concern with Nabisco prior to September 1997. Additionally, Watkins provides no testimony attesting to the support staff of similarly-situated Caucasian engineers.

Watkins allegations against Mancini are even less supported by the record.[24] Plaintiff, for instance, maintains that "Mancini yelled at and belittled Watkins before his colleagues, and made off-color comments." (Pl's Br. at 9–10.) In addition, Watkins claimed that "[d]uring Watkins' meetings with Mancini, at his cubicle and in the presence of other employees, Mancini would become loud, hostile and insulting, telling Watkins that he was stupid and was doing things incorrectly." (Id. at 10.) Watkins asserts that Mancini did not engage in similar treatment of Caucasian engineers. (Id.) Despite the allegation that some of Mancini's abusive behavior occurred in front of other Nabisco employees, Watkins' produces no evidence from other Nabisco employees to corroborate these allegations.

Even assuming arguendo that the above evidence satisfies element four of the prima facie case of discriminatory discharge, this Court finds that Watkins has not produced evidence tending to establish that Defendants' legitimate, non-discriminatory reasons for terminating Watkins were pretexts for discrimination. Defendants coun-

ter that they properly terminated Watkins based on his failure to meet Nabisco's job expectations. (Defs.' Br. at 19.) Specifically, Defendants maintain that Watkins' poor performance constituted a legitimate basis upon which they could execute their "traditional management prerogative" to terminate him. (Id. at 19–20.)

The employer's burden to articulate a legitimate reason for its unfavorable employment decision is "relatively light." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994). This Court therefore finds that Nabisco has met its burden of proffering a legitimate, non-discriminatory reason for terminating Watkins. Accordingly, in order to survive summary judgment, Watkins must point "to some evidence from which a factfinder could reasonably conclude that the defendants proffered reasons were fabricated." Fuentes, 32 F.3d at 764. Specifically, Watkins' "evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is pretext)." Id. (internal citations omitted.)

> To discredit the employer's proffered reason...the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsisten-

---

24. Plaintiff's Rule 56.1 Statement of Facts, strewn with unsupported allegations, states that "Team Leader, Larry White told Watkins that 'Watkins was going to be screwed by Phil Mancini no matter what and that Watkins should go on with it.'" (Pl.'s Rule 56.1 State-

ment ¶ 107.) Watkins asserted that Liam Laffin agreed with White's sentiments. (Id.) However, even though White was deposed in this case, Watkins points to no evidence corroborating these statements.

cies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *Id.* at 765. (internal citations omitted.)

Watkins' rebuttal evidence fall grossly short of this standard.

In response to Defendants' claim that Watkins' was unqualified for the position of Senior Process Control Engineer, Watkins first alleges that prior to Mancini's return to work from sick leave, his performance was found acceptable by Boyle. (Pl's Br. at 20.) Boyle's deposition testimony on this issue is as follows:

Q. By the time that Mr. Mancini came back, what were your—at that time, were you generally satisfied with Mr. Watkins' performance?

A. I don't know that I felt I was able to make a judgment about that, that I know I was glad to have Mr. Mancini back for obvious reasons that his absence was felt and that he would then be able to give, among other things, give Mr. Watkins closer supervision.

My feeling, as I recall, was that I really don't know rather than having a negative feeling.

Q: Okay. Did you, at some point, lose faith in Mr. Watkins' ability to perform the job?

A: I never decided that he did not have the ability. As I sit here today, I don't know that I feel that he doesn't have the ability to do the job. I don't know whether he does or not. He just didn't deliver. (Boyle Dep. at 48–53.) [25]

As illustrated, Boyle's testimony is much more equivocal than Watkins suggests. Moreover, Boyle's opinion as to whether Watkins was *able* to perform the duties of a Senior Process Control Engineer is irrelevant to whether he *did* perform those duties.[26] Therefore, Boyle's testimony that Watkins may have had the ability to perform his duties does not render Defendants' theory inconsistent or implausible.[27]

Of course, Watkins also suggests that his ability to perform his job adequately was hampered by fellow engineers. (Pl.'s Br. at 20.) Watkins states that he overheard a conversation in which Lomauro, a co-worker, stated an intention to "damage" him and force him out of his position. (Pl.'s Rule 56.1 Statement ¶ 37.) Watkins further alleges that his co-workers' primary method of ensuring Watkins' failure was their delay, or failure to provide information critical to completing his job. (*Id.* at 38.) For example, Watkins claimed that "[t]he average response time to my emails is approximately 8 business days. [Mooney] and [Lomauro] average about three weeks to open the emails and most of the time does [sic] not respond to them at all." [28] (Cohen Aff., Ex. N at 2.) Watkins

25. "Boyle Dep." refers to the transcript of the deposition of Boyle on December 13, 2000.

26. It is also interesting to note that although Boyle was technically Watkins' supervisor during Mancini's absence, it is undisputed that during that period, Watkins actually worked with minimal supervision. (Cohen Aff. Ex. I at 4.) In addition, Watkins' work load was less than what would normally be assigned to a Senior Process Control Engineer during that time. (*Id.*)

27. Watkins also cites the testimony of fellow engineer White stating that Watkins worked long hours and was very professional. (Pl.'s Rule 56.1 Statement ¶ 16; White Dep. at 28–29.) However, this testimony does not counter Defendants' arguments concerning the quality and substance of Watkins' work.

28. Defendants, meanwhile, maintain that "some of the tasks [Watkins] felt he could not accomplish did not depend upon input from [his co-workers]." (*Id.*, Ex. M.) Moreover, Defendants note that they had raised con-

points to testimony of Frederick, who recalled Watkins complaining about Mooney's failure to provide Watkins with information in a timely manner. (Frederick Dep. at 38.) In addition, Watkins points to the testimony of Lomauro, who admitted that he would sometimes delay by weeks his response to Watkins' emails. (Lomauro Dep. at 140–44.)

Finally, Watkins claims that Lomauro and Mooney held several meetings-deliberately excluding Watkins-in which they made important decisions for which Watkins was responsible, thereby bypassing Watkins in the decisionmaking process. (Pl.'s Rule 56.1 Statement ¶ 44.) Watkins points to Lomauro's testimony that he gave information to a programmer who reported to Watkins without Watkins' knowledge. (Lomauro Dep. at 88.)

Drawing all reasonable inferences in Watkins' favor, however, this Court nonetheless determines that Watkins has not offered evidence sufficient to rebut Defendants' claim that Watkins was terminated due to his poor work performance. To be sure, this Court is not presented with facts similar to those evaluated by the Third Circuit in *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200 (3d Cir.1987). In *Sorba*, the Third Circuit reversed a grant of summary judgment in favor of the employer on plaintiff's age discrimination claim. The employer argued that the decision to discharge plaintiff was based on his poor performance. 821 F.2d at 203. Plaintiff, relying on the deposition testimony of his supervisors, argued that the criticism of his performance was unfounded. *Id.* at 204. The Court concluded that plaintiff had produced evidence which cast doubt upon the defendant's dissatisfaction with plaintiff's work:

cerns about Watkins' performance well before his December memorandum alerted them to any alleged lack of cooperation from Watkins' co-workers. (*Id.*, Ex. AA at 85.)

[Plaintiff] does not dispute the fact that there were poor results on his last three jobs. He has proffered evidence, however, that his supervisors realized that the poor results were not his fault. Upon examination at their depositions, the testimony of the movant's witnesses was inconsistent regarding whether they believed [plaintiff's] performance caused the unsatisfactory job results. *Id.* at 205.

Conversely, Watkins has not proffered similar evidence to discredit Nabisco's reasons for his termination. Nabisco admits that its decision to terminate Watkins was based primarily on the reports of Mancini, his direct supervisor. (Cohen Aff., Ex. BB.) As of September 9, 1997, Mancini had outlined the following problem areas for Watkins: 1) failure to communicate with Mancini and other team members regarding the Atlanta line 9 project; 2) failure to maintain a current process control budget, work plan or schedule for the line 9 project; 3) failure to follow the Process Control Systems group software change request procedure; 4) failure to follow specific instructions regarding proper technical documentation of planned work; 5) failure to meet commitments and failure to provide reasonable expectations for doing so; and 6) failure to abide by the established business practices of the Process Control group and the Engineering department. (Cohen Aff., Ex. W at 1.)

In response to these alleged deficiencies, Watkins has only pointed to evidence suggesting that two of his co-workers delayed in responding to Watkins' requests for information. Watkins has not specified which requests Lomauro and Mooney delayed in responding to, or how such delays impacted his ability to correct the problem areas articulated by Mancini.[29] Contrary

29. Comparatively, Mancini maintains that some tasks, such as Watkins' completion of the control budget, did not depend upon the input of other individuals. (Cohen Aff., Ex.

to Watkins' allegations that Nabisco "set him up to fail", the record demonstrates that Nabisco attempted to address Watkins' concerns regarding his co-workers' lack of cooperation.[30]

Similarly, Watkins has not pointed to any evidence of exclusionary meetings, nor has he described what decisions were made in contravention of his authority. Although Watkins is not required to discredit each of Nabisco's proffered reasons in a vacuum, Watkins' limited evidence fails to cast doubt on even a substantial number of the legitimate business reasons provided by Nabisco. *See Fuentes,* 32 F.3d at 764, n. 7. In fact, by September of 1997, when Watkins was placed on the 90–day corrective action plan, Watkins admitted that he no longer worked with the allegedly offending co-workers and thus, no longer felt as if he was being mistreated because of his race. (Watkins Dep. at 368.)

Thus, excepting his unsupported allegations, Watkins has not pointed to any evidence establishing a reasonable inference that Nabisco's proffered explanation is unworthy of credence. Accordingly, this Court grants Nabisco's motion for summary judgment as to Watkins' racial discrimination claim under Title VII and the LAD.

### D. Retaliation

Under Title VII and the NJLAD, to advance a prima facie case of retaliation, Watkins must show: (1) that he engaged in a protected activity known to the employer; (2) that he was thereafter subjected to an adverse employment decision by the employer; and (3) that a causal link exists between the employee's protected activity and the employer's adverse action. *Delli Santi v. CNA Insurance Companies,* 88 F.3d 192, 198 (3d Cir.1996); *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir.1997). Defendants challenge Watkins' ability to establish element three of the prima facie case.[31] Specifically, Defendants maintain that Watkins has failed to offer any evidence that his December 1996 memorandum had a causal connection to Nabisco's decision to terminate him thirteen months later, in January 1998. (Defs.' Br. at 26.)

The Third Circuit has established two main factors in finding the necessary causal link between an employee's protected activity and the employer's adverse action: timing and evidence of ongoing antagonism. *Kachmar,* 109 F.3d at 177; *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir.1997). Although passage of time, alone, may not be legally conclusive proof against retaliation, a plaintiff may assert a temporal proximity between the protected activity and the termination in order to establish a causal link. *Woodson,* 109 F.3d at 921. A plaintiff may also establish the requisite causal link by demonstrating that the employer engaged in a pattern of ongoing antagonism in the period after plaintiff lodged his complaint. *Id.* Thus, the court must avoid taking "too narrow a view of the temporal proximity

M.) Watkins has not offered any contrary testimony or evidence.

**30.** See note 12, *supra.*

**31.** Defendants concede, for the purposes of the instant motion, that Watkins engaged in protected activity known by Nabisco. (Defs.' Br. at 26.) *See also, Abramson,* 260 F.3d at 287–88 (citing *Barber v. CSX Distrib. Servs.,*

68 F.3d 694, 701–02 (3d Cir.1995)) (noting that "acceptable forms of protected activity under Title VII... include formal charges of discrimination 'as well as informal protests of discriminatory employment practices, including making complaints to management...' ") It is beyond dispute that Watkins' termination fulfills the second prong of the prima facie case for a retaliation claim. *See id.* at 288.

needed to satisfy the causal link element..." *Kachmar*, 109 F.3d at 177.

It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation. *Id.* at 178.

■ In fact, a "broad array" of circumstantial evidence may be used to illustrate the causal link, including inconsistent reasons for termination, evidence casting doubt on reasons proffered for termination, and a change in demeanor after a complaint of discrimination. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 289 (3d Cir.2001). "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 177.

■ Watkins contends that he first raised concerns about discriminatory treatment to Nabisco employees in late 1995. (Compl.¶ 22.) The first document demonstrating Nabisco's awareness of Watkins' complaints is Mancini's October 1996 memorandum to Boyle. (Cohen Aff., Ex. M.) This is followed by Watkins' own December 6, 1996 memorandum. (*Id.*, Ex. N.) Watkins' March 1997 performance review-

completed approximately six weeks later, on February 19, 1997–reduced Watkins' overall rating from "effective" to "developmental." (*Id.*, Ex. U.) Nonetheless, Watkins was not terminated until January 1998. (*Id.*, Ex. CC.) Based on the above timeline, this Court determines that the protected activity Watkins engaged in during 1996 is temporally remote from his termination over a year later. Accordingly, Watkins "can prevail only if a reasonable jury could find that [Nabisco] engaged in a 'pattern of antagonism' in the period between his...complaints [to Mancini] and his firing." *Woodson*, 109 F.3d at 921.

Watkins contends that he has demonstrated a 'pattern of antagonism' which included Mancini setting Watkins up for failure by making him perform punitive and "make work" paperwork demands. (Pl.'s Br. at 26.) For instance, Watkins points to testimony suggesting that, unlike other engineers, Watkins was required to create functional specifications for software projects that already had been completed. (Boyle Dep. at 130–31.) Watkins also claims that Mancini would make Watkins work all night to finish a report, and then inform Watkins that he no longer needed the report.[32] (Pl.'s Br. at 26.)

This evidence-even taken together and viewed in the light most favorable to Watkins-is insufficient to support a finding of a pattern of antagonistic behavior that would allow Watkins to prevail on the causal link prong. Watkins' contentions that he worked long and performed "make work"

---

**32.** Additionally, Watkins claims that the sample reports Mancini provided to Watkins had the same cross-reference and value errors for which Watkins was faulted. (Pl.'s Rule 56.1 Statement ¶ 109.) In support of this allegation, Watkins references Boyle's testimony acknowledging that the last page of the six page sample budget form provided to Watkins was incomplete. (Boyle Dep. at 133–35.) Notwithstanding that only the last page of the sample report had missing information, the record is clear that Watkins was reprimanded for the "incorrect values and mathematical errors" in his own budget, not for failing to enter data. (Cohen Aff., Ex. Z at D001012, Ex. BB at 3.) Accordingly, Watkins' implication that his errors were guided or sanctioned by Defendants' training is unpersuasive.

tasks are extremely general: it is unclear, for instance, whether these situations occurred regularly throughout Watkins' three years at Nabisco, or whether they began only after Watkins voiced his harassment complaints.[33] Indeed, contrary to Watkins' allegations of retaliation, the record reveals that Nabisco actually attempted to assist Watkins in improving his performance.[34]

This Court has already noted, in its evaluation of Watkins' discrimination claim, the lack of evidence suggesting that Nabisco's proffered legitimate business reasons for terminating Watkins were pretextual. Likewise, Watkins has also failed to adduce evidence demonstrating that discrimination was more likely than not a motivating cause for his termination. Accordingly, this Court concludes that Watkins has failed to demonstrate a prima facie case of retaliation under Title VII or the LAD.[35] Nabisco's motion for summary judgment as to those claims is granted.

### E. 42 U.S.C. § 1981

Pursuant to Section 1981:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> . . . . .
>
> For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

Like Watkins' Title VII and LAD claims, his Section 1981 claim must be analyzed under the *McDonnell Douglas* burden shifting framework. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The parties concede that this Court's analysis of Watkins' Section 1981 claim is indistinguish-

33. In his deposition, Watkins implied that he worked late throughout the duration of his career at Nabisco: "I was there for three years. I worked routinely late most of the time." (Watkins Dep. at 598.) Watkins also admitted that Mancini's response to Watkins' reports was more varied than he had suggested previously: "Sometimes [Mancini would] just trash it. Sometimes he would ask me to do it differently or do it again. Any number of derivations or reactions." (*Id.*) Such evidence, as broadly described by Plaintiff, does not raise an inference of discrimination, nor does it cast doubt on Defendants' proffered reasons for termination. *See Abramson,* 260 F.3d at 289.

34. For instance, in the notes from a September 1997 meeting between Watkins and Nabisco management, Watkins was provided with examples of project task lists, a format for controlling budget and a project punch list. (Cohen Aff., Ex. J.) Watkins was also given a typing software package. (*Id.*) Each of these items specifically addressed the deficiencies pointed out to Watkins.

35. Based on this Court's conclusion that Watkins has failed to meet his burden of establishing a prima facie case of retaliation, it need not continue the burden shifting analysis required for pretext cases. *See e.g., Delli Santi,* 88 F.3d at 199 ("Once an employee succeeds in...establishing a prima facie case of retaliation [under the LAD]...the burden of production (although not the burden of persuasion) shifts to the employer to articulate some non-retaliatory reason for the adverse action. If the employer comes forward with evidence showing some legitimate non-retaliatory reason, the employee still has the opportunity to produce evidence sufficient to persuade the factfinder by a preponderance of the evidence that the employer nevertheless harbored a discriminatory intent.");

able from its analysis of Watkins' Title VII claims. (Tr. at 53–56.) Accordingly, for the reasons articulated above in the analysis of Watkins' discriminatory discharge and racial harassment claims, this Court finds that Watkins has failed to prove, by a preponderance of the evidence, a prima face case of discrimination under Section 1981. *See Patterson,* 491 U.S. at 186, 109 S.Ct. 2363. Defendants' motion for summary judgment as to Watkins' Section 1981 claim is therefore also granted.

### F. Mancini's Individual Liability

Initially, Watkins sought damages against Mancini personally under the LAD.[36] However, at oral argument, Watkins consented to voluntarily dismiss his complaint, in its entirety, to the extent that it seeks relief from Mancini in his individual capacity.[37] (Tr. at 16.) Watkins' resulting stipulation of dismissal, pursuant to FED. R. CIV. P. 41(a)(1), thus renders Defendants' motion for summary judgment as to Mancini moot.

## CONCLUSION

For the reasons stated above, this Court GRANTS Defendants' motion for summary judgment against Nabisco as to Plaintiff's racial harassment, discriminatory discharge and retaliation claims under Title VII, the LAD and § 1981. This Court DENIES as MOOT Defendants' summary judgment motion as to Mancini's individual liability under the LAD.

## ORDER

This matter having come before the Court on the motion of Defendants Nabis-

co, Inc. ("Nabisco")[1] and Philip Mancini ("Mancini") (collectively, "Defendants") for summary judgment, pursuant to FED. R. CIV. P. 56(c), as to each of Plaintiff Gene Watkins' ("Plaintiff") discrimination claims; and it appearing that Plaintiff has failed to establish prima facie cases of racial discrimination, pursuant to Title VII, the New Jersey Law Against Discrimination ("LAD"), and 42 U.S.C. § 1981, and retaliation, pursuant to Title VII and the LAD; and it further appearing that Plaintiff has also failed to produce evidence tending to establish that Defendants' proffered legitimate, non-discriminatory reasons for terminating Plaintiff were pretexts for racial discrimination; and it further appearing that Plaintiff has voluntarily dismissed his complaint, pursuant to FED. R. CIV. P. 41(a)(1), as to Defendant Mancini in his individual capacity;[2] and the Court having heard oral argument and considered each party's submissions, and good cause appearing,

IT IS on this 26th day of September, 2002,

ORDERED that Defendant's motion for summary judgment as to each of Plaintiff's five claims against Nabisco is GRANTED; and

IT IS FURTHER ORDERED that Defendant's motion for summary judgment as to Mancini's individual liability is DENIED as moot; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties

---

**36.** It is undisputed that Mancini could not be held liable for race discrimination under Title VII. *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1078 (3d Cir.1996) (finding that Congress did not intend to hold individual employees liable under Title VII).

**37.** *See* the Amended Stipulation and Order of Dismissal, filed July 23, 2002.

**1.** Nabisco is incorrectly named in the Complaint as "Nabisco Biscuit Company." (Defs.' Br. at 1.)

**2.** *See* the Amended Stipulation and Order of Dismissal, filed July 23, 2002.

within seven (7) days of the date of this Order.